**UNITED STATES of America, Plaintiff–Appellant–Cross–Appellee,**

v.

**SPACE HUNTERS, INC., John McDermott, Defendants–Appellees–Cross–Appellants.**

Docket No. 02–6313–CV(L), 04–6681–CV(XAP), 05–0481–CV(CON).

United States Court of Appeals, Second Circuit.

Argued: Sept. 16, 2005.

Decided: Nov. 9, 2005.

Andrew W. Schilling, Assistant United States Attorney, for David N. Kelley, United States Attorney for the Southern District of New York, New York, N.Y. (Sara L. Shudofsky, on the brief), for Plaintiff–Appellant–Cross–Appellee.

E. Christopher Murray, Reisman, Peirez & Reisman, L.L.P., Garden City, N.Y. (Megan F. Carroll, on the brief), for Defendants–Appellees–Cross–Appellants.

Before: McLAUGHLIN and CABRANES, Circuit Judges, and MUKASEY, District Judge.*

McLAUGHLIN, Circuit Judge.

This appeal arises from defendants Space Hunters, Inc. and John McDermott's (together, "defendants") alleged dis-

---

* The Honorable Michael B. Mukasey, Chief Judge, United States District Court for the Southern District of New York, sitting by designation.

crimination, based on both race and disability, in the New York City room rental market. The Government brought seven claims for relief against the defendants under the Fair Housing Act (the "FHA"), which prohibits discrimination in the housing market based on, *inter alia,* race, color, religion, sex, national origin, or disability. The United States District Court for the Southern District of New York (Casey, J.) dismissed all but one of those claims.

At trial on the remaining claim, the district court struck the Government's claim for punitive damages. The jury returned a verdict in favor of the Government, and the district court denied defendants' motion for judgment as a matter of law. The Government now appeals the district court's dismissal of six of their seven FHA claims and the district court's decision to strike its claim for punitive damages. Defendants cross-appeal the district court's denial of their motion for judgment as a matter of law.

We hold that the district court (1) erred in limiting the application of section 804(c) of the FHA to owners and their agents; (2) erred in treating the exemption found in section 803(b)(2) as a jurisdictional limitation; (3) should have allowed the jury to consider punitive damages; *and* (4) correctly denied defendants' motion for judgment as a matter of law. Thus, we affirm in part, vacate in part, and remand for further proceedings consistent with this opinion.

## BACKGROUND

John McDermott has been involved in the rental housing market in New York City and surrounding areas since 1976. In that time, he has operated or worked for several different corporations that supply housing information to prospective renters.

From the late 1980s until April 1996, McDermott operated a corporation enti-

tled Places to Live, Inc., where he admittedly steered prospective tenants to rooms on the basis of race. Because of this practice, the State of New York and others sued Places to Live and McDermott in February 1994, alleging violations of the FHA and other federal and state statutes. In June 1996, that action was settled through a consent judgment, which permanently enjoined McDermott from, *inter alia,* violating the FHA.

In February 1996, the State of New York commenced a separate proceeding against McDermott seeking to revoke his real estate broker's license. A hearing examiner found, *inter alia,* that McDermott had continued his practice of racial steering despite the 1996 consent judgment and another consent order that had been entered in 1993, and revoked McDermott's broker's license in October 1997.

Three days before the revocation of his broker's license, McDermott started a corporation entitled Space Hunters. Space Hunters, in its capacity as a housing information vender, compiles information from classified advertisements about rooms for rent in New York City, advertises the availability of rooms for rent, communicates with owners or landlords of rooms for rent, and refers prospective tenants according to their preferred neighborhood and price range. Space Hunters charges prospective tenants a fee for its services, usually $100 for an individual and $125 for a couple. According to defendants (but disputed by the Government), Space Hunters does not advertise apartments or rooms at locations where the owner does not reside or where more than four families live.

In March 2000, the Government sued defendants in the Southern District of New York, alleging several violations of

the FHA. The complaint alleges the following.

In January 1999, Keith Toto, who is deaf, telephoned Space Hunters through the services of a relay service operator after seeing a Space Hunters newspaper advertisement.[1] The person who answered the call told Toto that Space Hunters does not service the disabled. When Toto persisted, the Space Hunters employee said, "[e]at shit," and hung up.

In February 1999, Toto filed a claim with the United States Department of Housing and Urban Development ("HUD") alleging that Space Hunters discriminated on the basis of disability. In March 1999, a HUD investigator requested the Fair Housing Council of Northern New Jersey (the "FHC"), a non-profit group used by HUD to assist with investigations into alleged FHA violations, to conduct a test to determine if Space Hunters discriminates against disabled individuals. That same month, an FHC tester called Space Hunters through a relay service operator. The person who answered the call at Space Hunters refused to speak with the tester through the operator, stating only, "[g]ive me shit about Jesus Christ Almighty," and ended the call.

A few days later, a second tester called Space Hunters through a relay service operator. The person who answered the phone at Space Hunters said, "[n]ot interested, take a hike," and hung up the telephone.

Thereafter, a HUD investigator telephoned Space Hunters and informed the person with whom she spoke that she was investigating a complaint alleging discrimination against persons with disabilities. The individual at Space Hunters became abrasive and loud, arguing that he was not required to deal with hearing-impaired people. When the HUD investigator, who is black, described the complaint's allegations, the individual at Space Hunters responded with an expletive and a racial epithet.[2]

In light of the use of a racial epithet by a Space Hunters employee, HUD asked the FHC to conduct tests to determine whether Space Hunters also discriminates on the basis of race. In April 1999, the FHC sent several testers to Space Hunters.

The FHC testers heard McDermott repeatedly make derogatory remarks about blacks and use racial epithets. For example, a white tester observed McDermott treat a black couple in a rude and condescending manner. After they left his office, McDermott made crude remarks about the couple. McDermott called the white tester the "Donald Trump" of people who usually come to his office, saying that he "get[s] a lot of lowlife, scumbag [minorities] that come in." Additionally, Space Hunters treated black and white testers

---

1. As the district court described, "[d]eaf individuals use a relay service operator in conjunction with a telecommunication device for the deaf, or TDD. The deaf individual types a message on the TDD keyboard, which is transmitted over telephone lines to a relay service operator who reads the message to the person on the other end of the call. The relay service operator then types the person's response, which is transmitted back to the screen of [the] deaf individual's TDD." *See generally* 47 U.S.C. § 225 (defining "TDD" and "telecommunications relay services" and requiring that such services be generally available to hearing-and speech-impaired people).

2. At his deposition, McDermott admitted that he was the individual at Space Hunters who spoke with the HUD investigator. In fact, McDermott is the sole employee of Space Hunters and has never denied that he was the Space Hunters representative on all the telephone calls at issue in this case.

differently under similar circumstances and did not provide the same range of services to the black testers as it provided to the white testers.

After its tests were complete, the FHC filed a complaint with HUD alleging that defendants discriminated in the housing market in violation of the FHA. In January 2000, HUD issued a charge of discrimination, pursuant to 42 U.S.C. § 3610(g)(2)(A), based on both Toto's and the FHC's complaints. Defendants elected, pursuant to 42 U.S.C. § 3612(a), to have the charges heard in a civil action instead of a hearing before a HUD administrative law judge. Thereafter, pursuant to 42 U.S.C. § 3612(o)(1), the Secretary of HUD authorized the Attorney General to commence this action in the district court on behalf of Toto and the FHC.

The complaint alleges seven claims for relief under the FHA. The first four claims are brought on behalf of Toto. Claim One alleges that defendants discriminated against Toto in the rental market because of Toto's disability, in violation of section 804(f)(1)(A) of the FHA, 42 U.S.C. § 3604(f)(1)(A). Claim Two alleges that defendants refused to accommodate Toto's disability in violation of section 804(f)(3)(B) of the FHA, 42 U.S.C. § 3604(f)(3)(B). Claim Three alleges that defendants made discriminatory statements to Toto in violation of section 804(c) of the FHA, 42 U.S.C. § 3604(c). Claim Four alleges that defendants denied Toto access to rental services in violation of section 806 of the FHA, 42 U.S.C. § 3606.

The remaining three claims are brought on behalf of the FHC testers. Claim Five alleges that defendants made housing unavailable to the testers because or race or color in violation of section 804(a) of the FHA, 42 U.S.C. § 3604(a). Claim Six alleges that defendants discriminated against the testers in violation of section 804(b) of the FHA, 42 U.S.C. § 3604(b). Claim Seven alleges that defendants made discriminatory statements to the testers in violation of section 804(c) of the FHA, 42 U.S.C. § 3604(c).

The complaint seeks declaratory and injunctive relief. It also asks for compensatory and punitive damages.

In December 2000, defendants moved to dismiss the complaint. In August 2001, the district court granted the motion as to all the claims except Claim Four. *United States v. Space Hunters, Inc.*, No. 00 Civ. 1781(RCC), 2001 WL 968993 (S.D.N.Y. Aug.24, 2001). The district court dismissed Claims One, Two, Five, and Six based on the exemption in section 803(b)(2) of the FHA, 42 U.S.C. § 3603(b)(2), which states that most of the provisions of section 804 of the FHA, 42 U.S.C. § 3604, do not apply to housing that is occupied by four or less families and in which the owner lives. The district court found that Space Hunters "only lists rooms in owner-occupied buildings where less than four families live independently of each other." Based on that finding, the court assumed that it lacked jurisdiction over claims to which the exemption applied.

With respect to Claims Three and Seven, the district court held that section 804(c) of the FHA, 42 U.S.C. § 3604(c), applies only to dwelling owners and their agents. The court found that Space Hunters is neither an owner nor an agent, and, thus, the Government failed to state a section 804(c) claim.

Finally, the district court denied defendants' motion with respect to Claim Four, rejecting defendants' argument that section 806 of the FHA, 42 U.S.C. § 3606, applies only to "multiple listing services."

In October 2002, the district court conducted a jury trial on the surviving Claim Four. The Government called four wit-

nesses: McDermott, Toto, one of the FHC testers, and the HUD investigator who investigated Toto's complaint.

McDermott testified as follows.[3] Space Hunters does not accept telephone calls from people using a relay service operator. In fact, McDermott said he "hang[s] up on every one of them." McDermott testified that "no relay calls will ever be taken by my office" and he will "never have to change this practice." When hearing-impaired people call, McDermott tells them that Space Hunters does not "accept relay service operator calls under [any] circumstances." That policy was in effect in 1999 and remained in effect at the time of trial. When relay service operators call more than once, McDermott "let[s] them know that [he is] annoyed." In such circumstances, "it could escalate to a level where [McDermott] certainly want[s] to chase them away from continuing to call back."

McDermott testified that Space Hunters does not take relay service operator calls because "it takes too much time and that guy can't come in and sign up anyway because he is not able to come to my business and do business with me. And I am not going to deal with somebody and use sign language." McDermott explained that "[i]t is not about losing business. It is about what is reasonable under the law." He said, "[t]here has to be cases where you can say to a relay service operator go rub salt up your ass." McDermott described relay service operator calls as "very, very annoying" and "a very, very unpleasant experience."

McDermott testified that when a potential customer calls Space Hunters for the first time, he asks them to come to the Space Hunters office. He also asks them "where they want to live and things like that." When Toto called Space Hunters in

1999, McDermott admitted that he told him, through the relay service operator, to "eat shit, asshole."

McDermott further testified that he records telephone calls to Space Hunters to protect against someone making false allegations about Space Hunters. However, he erased the tapes of the calls at issue in this case.

Following McDermott's testimony, Toto testified as follows. In January 1999, after seeing an advertisement in a newspaper, he called Space Hunters through a relay service operator because he was looking for a room in the Bronx. The person who answered the call at Space Hunters told him to "eat shit" and stated that Space Hunters does not help disabled people. Toto made a second call to Space Hunters and the person who answered the call told Toto that if he called again, Space Hunters would file harassment charges against him. Toto tried a third call in February 1999, and Space Hunters again refused to take his call. As a result of this treatment, Toto filed a complaint with HUD. Toto never went to the Space Hunters office.

William Donegan, an FHC tester, testified next. In March 1999, he twice called Space Hunters through a relay service operator. In the first call, the relay service operator informed Donegan that an initial automated answering message said that potential customers should go to the Space Hunters office in order to do business with it. Then, the person who answered the phone after the automated message said, "Give me shit, Jesus Christ Almighty," and ended the call. In the second call, the person who answered the call hung up after saying "I am not interested. Take a hike."

**3.** This summary of McDermott's testimony includes his testimony at trial and excerpts from his deposition that the Government read to the jury.

Vanessa Summers, the HUD investigator who investigated Toto's complaint, testified that after receiving the results of the FHC's tests, she called Space Hunters in March 1999. She asked to speak with a manager. A male, who refused to give his name, identified himself as the manager. When Summers explained that she was investigating a complaint, the Space Hunters manager "proceed[ed] to tell [her] about their rights under the Fourteenth Amendment, that they do not have to deal with a disabled person who uses a relay service, and if a disabled person, a hearing impaired person would come to their office that they would not gain entry into the building and that they would not be able to communicate with an agent." The manager was "disrespectful," "loud," "indignant," and "abrasive."

The Government submitted into evidence three letters that McDermott wrote to HUD during its investigation. In these letters, McDermott explained that Space Hunters has "a policy of not accepting relay operator calls," and "[t]here is never any discussion with any relay operator regarding anything." He also argued that HUD "has no subject matter jurisdiction" over Toto's complaint because Space Hunters deals in rooms that are not covered by the FHA. Therefore, Space Hunters does not "have to lift a finger to comply" with the FHA. McDermott also called Toto a "malicious prevaricator," a "clown," and a "falsifier," and requested that HUD have Toto arrested for "perpetuating a fraud and playing the department like a cheap violin." [4]

Defendants did not call any witnesses at trial.

At the charging conference, the district court granted defendants' motion to strike the Government's claim for punitive damages, stating: "I find the record to be devoid of any evil intent on behalf of the defendant or callous disregard for Mr. Toto's legal rights." The jury returned a verdict in favor of the Government and awarded Toto $1500 in compensatory damages.

Following the trial, defendants moved for judgment as a matter of law, and the Government moved for injunctive relief. In November 2004, the district court denied defendants' motion and granted the Government's motion, permanently enjoining defendants from violating the FHA and requiring various record-keeping and monitoring obligations for a period of three years. *United States v. Space Hunters, Inc.*, No. 00 Civ. 1781(RCC), 2004 WL 2674608 (S.D.N.Y. Nov.23, 2004).

This appeal and cross-appeal followed.

## DISCUSSION

In its appeal, the Government argues that the district court erred by (1) dismissing Claims Three and Seven brought under section 804(c) of the FHA; (2) dismissing Claims One, Two, Five, and Six based on the exemption found in section 803(b)(2) of the FHA; *and* (3) striking the Government's claim for punitive damages. In

---

**4.** In one of the letters, McDermott posed a "hypothetical" that speaks volumes about his feelings toward the FHA and disabled people. In his hypothetical, Toto has no arms, no legs, and cannot speak or hear. "Then let's say the Space Hunter official told him flat out we have no landlords that will rent to him because of his defects, therefore we will not waste our time with you on the phone and we are now hanging up. However, if you please Mr. Toto, we can use you as a second base bag when we play baseball this weekend. As [p]olitically incorrect and insensitive as that scenario may be, it still does not violate the Fair Housing Act in its current state as it pertains to the rental of rooms in private homes."

their cross-appeal, defendants argue that the district court erred in denying their post-trial motion for judgment as a matter of law. We address each issue in turn.

## I. *The Section 804(c) Claims*

The first issue is whether the rule against discriminatory statements found in FHA section 804(c) applies only to dwelling owners and their agents. We reject so crabbed a reading.

We review de novo the grant of a motion to dismiss for failure to state a claim. *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996). In so doing, "we accept all of plaintiff's factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the plaintiff." *Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.,* 191 F.3d 198, 202 (2d Cir.1999).

Section 804(c) of the FHA makes it unlawful

> [t]o make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination.

42 U.S.C. § 3604(c).

In this case, the district court held that section 804(c)—specifically, the phrase "with respect to the sale or rental of a dwelling"—applies only to dwelling owners or their agents. It reached this conclusion by relying on what it said to be the "purpose" of the statute: "to prevent expressions that result in the denial of housing, not to prevent all discriminatory expression." Because it found that defendants are neither owners nor agents and that applying section 804(c) to them "would not further the purpose of the statute," the district court dismissed Claims Three and Seven. We disagree with this interpretation.

The district court's assessment of the "purpose" of section 804(c) is inconsistent with the statute's plain language, which applies broadly to "*any* notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates" a discriminatory preference on prohibited grounds. 42 U.S.C. § 3604(c) (emphasis added). Nothing in this language limits the statute's reach to owners or agents or to statements that directly effect a housing transaction. Indeed, this language "does not provide any specific exemptions or designate the persons covered, but rather . . . applies on its face to anyone" who makes prohibited statements. *United States v. Hunter,* 459 F.2d 205, 210 (4th Cir.1972) (internal quotation marks omitted); *see also Ragin v. N.Y. Times Co.,* 923 F.2d 995, 999 (2d Cir.1991) ("Congress used broad language in [section 804(c), and there is no cogent reason to narrow the meaning of that language."]).[5]

Moreover, the district court's view that section 804(c)'s purpose is to "prevent expressions that result in the denial of housing" is too narrow. The statute also "protect[s] against [the] psychic injury" caused by discriminatory statements made in connection with the housing market. Robert G. Schwemm, *Discriminatory Housing*

---

**5.** To the extent that *Michigan Protection & Advocacy Service, Inc. v. Babin,* 799 F.Supp. 695 (E.D.Mich.1992), *aff'd on other grounds,* 18 F.3d 337 (6th Cir.1994); and *Heights Community Congress v. Hilltop Realty, Inc.,* 629 F.Supp. 1232 (N.D.Ohio 1983), *aff'd in part, rev'd in part,* 774 F.2d 135 (6th Cir.1985), limit the application of section 804(c) to owners and their agents, we find their reasoning unpersuasive.

*Statements and § 3604(c): A New Look at the Fair Housing Act's Most Intriguing Provision,* 29 Fordham Urb. L.J. 187, 250 (2001); *see also HUD ex rel. Stover v. Gruzdaitis,* No. 02–96–0377–8, 1998 WL 482759, at *3 (HUD ALJ Aug. 14, 1998) (stating that section 804(c) protects the right "to inquire about the availability of housing without being subjected to racially discriminatory statements"). If that were not so, Congress likely would not have made section 804(c) applicable to dwellings that are otherwise exempt from section 804's prohibition on discrimination. *See* 42 U.S.C. § 3603(b). In fact, we have permitted plaintiffs to recover for discriminatory advertising even when the plaintiffs were not in the market for housing. *See Ragin v. Harry Macklowe Real Estate Co.,* 6 F.3d 898, 903–04 (2d Cir.1993).

Defendants attempt to evade the sweep of section 804(c) by invoking the First Amendment. Specifically, defendants claim that "[u]nder the Government's expansive reading of [section 804(c)] anyone who 'make[s]' a statement indicating discrimination in race, religion, family status, *etc.* would be liable, including private individuals who may state they do not like children living on their block." Defs.' Br. at 42. Defendants are wrong.

While there may indeed be some cases in which the breadth of section 804(c) encroaches upon the First Amendment, this is not one of those cases. This case (unlike defendants' hypothetical) unmistakably involves commercial speech, a subset of speech for which the First Amendment " 'accords a lesser protection ... than to other constitutionally guaranteed expression.' " *Ragin,* 923 F.2d at 1002 (quoting *Cent. Hudson Gas & Elec. v. Pub. Serv. Comm'n,* 447 U.S. 557, 562–63, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980)). Courts have consistently found that commercial speech that violates section 804(c) is not protected

by the First Amendment. *See, e.g., id.* at 1002–03; *Hunter,* 459 F.2d at 211–13.

For these reasons, we hold that the district court erred in limiting the application of section 804(c) to owners and their agents and should not have dismissed Claims Three and Seven.

## II. *The Section 803(b)(2) Exemption*

 Section 803(b)(2) of the FHA (commonly referred to as the "Mrs. Murphy" exemption on the theory then that the statute did not reach the metaphorical "Mrs. Murphy's boardinghouse," *see* 114 Cong. Rec. 2495, 3345 (1968)) provides that

[n]othing in section [804] ... (other than subsection (c)) shall apply to ... rooms or units in dwellings containing living quarters occupied or intended to be occupied by no more than four families living independently of each other, if the owner actually maintains and occupies one of such living quarters as his residence.

42 U.S.C. § 3603(b)(2). Defendants, and the district court, regard this exemption as a limitation on subject matter jurisdiction. We conclude that it is an affirmative defense having no bearing on jurisdiction.

The district court dismissed Claims One, Two, Five, and Six, finding that the "Mrs. Murphy" exemption "deprives the Court of subject matter jurisdiction" because defendants' "publication only lists rooms in owner-occupied buildings where less than four families live independently of each other." In arriving at this conclusion, the district court appears to have considered evidence outside the complaint, and it prematurely resolved a disputed factual issue at the pleadings stage.

 While a district court may resolve disputed jurisdictional fact issues by resort to evidence outside the pleadings, *Filetech S.A. v. France Telecom S.A.,* 157

F.3d 922, 932 (2d Cir.1998), a "defendant's assertion · of a position that is properly characterized as an affirmative defense" is not a jurisdictional fact issue. *In re Stock Exchs. Options Trading Antitrust Litig.,* 317 F.3d 134, 150–51 (2d Cir.2003). A court may dismiss a claim on the basis of an affirmative defense only if "the facts supporting the defense appear on the face of the complaint," and "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *McKenna v. Wright,* 386 F.3d 432, 436 (2d Cir.2004) (internal quotation marks omitted).

Courts have consistently characterized exemptions to the FHA as affirmative defenses. *See, e.g., Massaro v. Mainlands Section 1 & 2 Civic Ass'n, Inc.,* 3 F.3d 1472, 1474, 1476 n. 6 (11th Cir.1993) (characterizing the "housing for older persons" exemption as an affirmative defense); *Hooker v. Weathers,* 990 F.2d 913, 916 (6th Cir.1993) (same); *United States v. Columbus Country Club,* 915 F.2d 877, 882–85 (3d Cir.1990) (treating the "religious organization" and "private club" exemptions as affirmative defenses). While these exemptions are found in other sections of the FHA, there is no reason to treat the "Mrs. Murphy" exemption differently.

Moreover, when considering whether a fact "that Congress has specified as a prerequisite for the application of a federal statute" is "an ingredient of subject matter jurisdiction or the merits," we look to two considerations: (1) "the consequences of a determination that some fact or circumstance is an ingredient of subject matter jurisdiction," *and* (2) "the wording of the statute identifying the authority of a court

to consider the case at hand." *Da Silva v. Kinsho Int'l Corp.,* 229 F.3d 358, 363, 365 (2d Cir.2000).

With respect to the first *Da Silva* factor, federal courts must examine their jurisdiction when it is questionable even if no party has raised the issue. *Travelers Ins. Co. v. Carpenter,* 411 F.3d 323, 328 (2d Cir.2005). Thus, one consequence of characterizing the "Mrs. Murphy" exemption as a jurisdictional question would be that courts (including circuit courts) must search the record to eliminate the possibility that this fact-intensive exemption does not apply even when the issue is not addressed by either party. Requiring such an exercise makes little sense, especially since the record may be silent on the issue. *Cf. Sharpe v. Jefferson Distrib. Co.,* 148 F.3d 676, 678 (7th Cir.1998).

As to the second *Da Silva* factor, the wording of the statutes conferring authority upon federal courts to hear FHA cases supports treating the exemption as irrelevant to the question of jurisdiction. Congress conferred jurisdiction on federal courts to hear FHA claims in 42 U.S.C. § 3612(*o*), as well as 28 U.S.C. §§ 1331 (federal question jurisdiction), 1343(a)(4) (jurisdiction over civil rights cases), and 1345 (jurisdiction over cases in which the United States is the plaintiff). None of these provisions make the non-applicability of the "Mrs. Murphy" exemption "an explicit ingredient of subject matter jurisdiction." *Da Silva,* 229 F.3d at 365.

Because the "Mrs. Murphy" exemption is an affirmative defense having no bearing on subject matter jurisdiction, the district court should not have considered evidence outside the complaint.[6] *See McKenna,* 386

---

6. The district court appears to have relied on an affidavit submitted by McDermott in which he baldly asserts that all the rooms Space Hunters advertises fall within the "Mrs. Murphy" exemption. Whether the exemption ap-

plies, however, is a "highly fact-dependent inquir[y]." *Hogar Agua y Vida en el Desierto, Inc. v. Suarez–Medina,* 36 F.3d 177, 182 n. 4 (1st Cir.1994). It is hard to see how submitting an affidavit that does little more than

F.3d at 436. Thus, the district court erred in dismissing Claims One, Two, Five, and Six.

### III. *Punitive Damages*

The Government argues that the district court erred in striking its claim for punitive damages. We agree.

■ We review de novo a district court's refusal to submit the issue of punitive damages to a jury. *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 101 (2d Cir.2001).

■ The FHA expressly provides for the recovery of punitive damages by plaintiffs who have suffered discriminatory housing practices. 42 U.S.C. § 3613(c)(1). Punitive damages are limited "to cases in which the [defendant] has engaged in intentional discrimination and has done so with malice or with reckless indifference to the federally protected rights of an aggrieved individual." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 529–30, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999) (internal quotation marks omitted). "Malice and reckless indifference refer to 'the [defendant's] knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination.'" *Farias*, 259 F.3d at 101 (quoting *Kolstad*, 527 U.S. at 535, 119 S.Ct. 2118). A plaintiff may establish the requisite state of mind for an award of punitive damages with evidence (1) that the defendant "discriminate[d] in the face of a perceived risk that its actions ... violate[d] federal law," *Kolstad*, 527 U.S. at 536, 119 S.Ct. 2118, *or* (2) of "egregious or outrageous acts" that "may serve as evidence supporting an inference of the requisite 'evil motive.'" *Farias*, 259 F.3d at 101 (internal quotation marks and alteration omitted) (quoting *Kolstad*, 527 U.S. at 538, 119 S.Ct. 2118).

track the language of the exemption discharg-

Here, the district court struck the Government's claim for punitive damages because it found "the record to be devoid of any evil intent on behalf of the defendant or callous disregard for Toto's legal rights." This ruling overlooked ample evidence that defendants acted with malice and reckless indifference to Toto's federally protected rights.

■ *First,* there can be no dispute that McDermott was generally—indeed acutely—aware of the FHA. A consent judgment had been previously entered against him in which he was "personally" enjoined from violating the FHA, expressly including discriminating in housing on the basis of a disability. And the State of New York revoked his real estate license in 1997, in part because of FHA violations. Moreover, McDermott's letters to HUD during the course of its investigation into Toto's complaint demonstrate a vast, if skewed, awareness of the FHA. Thus, McDermott cannot argue that he did not know about the FHA. *See Preferred Props., Inc. v. Indian River Estates, Inc.*, 276 F.3d 790, 800 (6th Cir.2002) (stating that punitive damages are available under the FHA where evidence shows "malice or reckless indifference that [a defendants'] actions might violate a federal statute of which they were aware" (internal quotation marks omitted)).

*Second,* the Government presented evidence that defendants "discriminate[d] in the face of a perceived risk that [their] actions ... violate[d]" the FHA. *See Kolstad*, 527 U.S. at 536, 119 S.Ct. 2118. For example, the jury could have inferred that McDermott knew he was acting improperly based on the fact that he erased his recordings of the telephone conversations at issue in this case—recordings that he

es defendants' burden.

purportedly made to protect himself from allegations of misconduct. *Cf. EEOC v. Wal–Mart Stores, Inc.*, 156 F.3d 989, 993 (9th Cir.1998) (stating that evidence of a defendant's actions to cover up discriminatory conduct can support an inference that the defendant acted with reckless indifference to a federally protected right).

*Third,* the record is awash with evidence of "egregious" and "outrageous" acts by defendants that could support an inference of the requisite " 'evil motive.' " *See Kolstad,* 527 U.S. at 538, 119 S.Ct. 2118. McDermott did not simply hang up on relay calls. He used profanity "to chase them away from continuing to call back." *Cf. Alexander v. Riga,* 208 F.3d 419, 431 (3d Cir.2000) (stating that recklessness and malice can be inferred when a defendant repeatedly refuses to deal with blacks). He told Toto to "eat shit, asshole"—not the most judicious of remarks—and that Space Hunters does not do business with disabled people. *Cf. Fountila v. Carter,* 571 F.2d 487, 492 (9th Cir.1978) (holding that a punitive damages award was supported by the fact that the defendant hung up on the plaintiff when she learned he was black). McDermott also threatened Toto with harassment charges if he called Space Hunters again. And McDermott told the HUD investigator that "if a disabled person, a hearing impaired person would come to [his] office ... they would not gain entry into the building."

*Finally,* given McDermott's history, this case is particularly appropriate for consideration of punitive damages. "[T]he purpose of punitive damage awards is to punish the defendant and to deter him and others from similar conduct in the future."

*Vasbinder v. Scott,* 976 F.2d 118, 121 (2d Cir.1992). McDermott is an FHA recidivist. As the district court stated, "the trial record is replete with suggestions that McDermott is likely to violate the [FHA] in the future," and his conduct thus far has demonstrated "a contemptuous disregard for judicial and executive authority." He was enjoined from violating the FHA in 1996.[7] Yet, in 1997, a hearing examiner found that McDermott continued to violate the FHA *despite* the 1996 injunction. And now the jury in this case has found that McDermott has violated the FHA yet again. In light of the circumstances, the Government was entitled to have the jury consider this history and decide whether, this time, punitive damages were necessary to deter defendants from returning to their previous practices. *Cf. Miller v. Apartments & Homes of N.J., Inc.*, 646 F.2d 101, 111 (3d Cir.1981) (affirming award of punitive damages when defendant had been subject to a consent decree enjoining discrimination but did not comply with the injunction).

## IV. *Judgment as a Matter of Law*

In their cross-appeal, defendants argue that the district court should have granted their motion for judgment as a matter of law after trial. We disagree.

 We review de novo a district court's denial of a motion for judgment as a matter of law. *Harris v. Niagara Mohawk Power Corp.*, 252 F.3d 592, 597 (2d Cir.2001). Judgment as a matter of law is proper when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed.R.Civ.P. 50(a)(1). A court considering

---

7. At his deposition, McDermott testified that he did not know what the terms of the injunction entailed because his copy of the consent judgment was "in the garbage." The record does not reflect whether the State of New York has sought to have McDermott held in contempt for his apparent repeated violations of the 1996 injunction.

a request for judgment as a matter of law must " 'consider the evidence in the light most favorable to the party against whom the motion was made and . . . give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence.' " *Tolbert v. Queens Coll.*, 242 F.3d 58, 70 (2d Cir.2001) (quoting *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 367 (2d Cir.1988)). " 'The court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury.' " *Id.* (quoting *Smith,* 861 F.2d at 367). A jury verdict should be set aside only where there is " 'such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or . . . such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him.' " *Song v. Ives Labs., Inc.*, 957 F.2d 1041, 1046 (2d Cir.1992) (omission in original) (quoting *Mattivi v. S. African Marine Corp.*, 618 F.2d 163, 168 (2d Cir.1980)).

 Defendants argue that the Government presented no evidence at trial that defendants treated disabled people differently from non-disabled people, and they contend that such evidence is necessary for a finding of discrimination. Specifically, defendants claim that what the evidence shows is that McDermott refused to engage in lengthy telephone calls with anyone. The Government argues that evidence of disparate treatment is not necessary. We need not delve into this casuistry, however, because, as Judge Friendly once noted, "[w]hatever the conceptual beauty of the argument, it neglects the facts." *Farrell v. Piedmont Aviation, Inc.*, 411 F.2d 812, 816 (2d Cir.1969).

The jury heard a virtual tsunami of evidence that defendants did treat disabled people generally—and Toto specifically—differently from non-disabled people. McDermott testified that when non-hearing-impaired people called Space Hunters, he talked to them, including answering their questions, inviting them to the office, and asking them what neighborhood they wanted to live in. In stark contrast, when Toto and a tester called, McDermott swore at them and ended the call. He specifically told Toto that Space Hunters does not deal with disabled people, and he told the HUD investigator that disabled people would not even be able to enter the Space Hunters office. In one of his letters to HUD, McDermott wrote, "[t]here is never any discussion with any relay operator regarding anything."

Defendants also claim that "the Government offered no evidence that Mr. Toto attempted to go to defendants' place of business to employ their services." In light of Toto's testimony that McDermott told him that Space Hunters does not service disabled people, this argument borders on the frivolous. The FHA does not require Toto to go to Space Hunters to confirm what he was caustically told; he was entitled to take McDermott at his word.

The jury heard sufficient evidence to find that defendants violated the FHA by discriminating against Toto based on his disability. Thus, we affirm the district court's denial of defendants' motion for judgment as a matter of law.

## CONCLUSION

For the foregoing reasons, we (1) vacate the district court's dismissal of Claims One, Two, Three, Five, Six, and Seven; (2) vacate the district court's refusal to charge the jury on punitive damages; (3) affirm the district court's denial of defendants' motion for judgment as a matter of law;

*and* (4) remand this case for further proceedings consistent with this opinion.