**Sylvia PANETTA, Plaintiff–Appellee,**

**v.**

**Thomas M. CROWLEY, Marc Jurnove, Defendants–Appellants,**

**Patricia A. Kelvasa, John Doe I, Defendants.**

**Docket No. 02–7275–cv.**

United States Court of Appeals, Second Circuit.

Argued: Jan. 3, 2005.

Reargued: Oct. 26, 2005.

Decided: Aug. 18, 2006.

David Lawrence III, Assistant Solicitor General (Eliot Spitzer, Attorney General of the State of New York, Michael S. Belohlavek, Deputy Solicitor General, of counsel), New York, NY, for Defendant–Appellant Thomas A. Crowley.

Marc Jurnove, Plainview, NY, pro se.

Sylvia Panetta, Middletown, NY, pro se.

Charles D. Riely, Akin Gump Strauss Hauer & Feld LLP (Jonathan M. Jacobson, Matthew J. Atlas, on the brief), New York, NY, for Amicus Curiae.

Before FEINBERG, WINTER, and SOTOMAYOR, Circuit Judges.

WINTER, Circuit Judge.

After a jury trial, defendant Thomas A. Crowley was found liable under 42 U.S.C. § 1983 for the false arrest of plaintiff Sylvia Panetta. Defendant Marc Jurnove was held not liable for claims of malicious prosecution and conspiring to subject Panetta to false arrest. Judge Yanthis denied Panetta's motion for a new trial on damages, Crowley's post-trial motion for judgment as a matter of law or a new trial, and Jurnove's motion for attorneys' fees and costs. Judge Yanthis also awarded Panetta $1,000 in punitive damages and ordered Crowley to pay Panetta $50,894.03 in attorneys' fees and costs.

Crowley appeals, arguing that he had probable cause as a matter of law to arrest Panetta or, in the alternative, that he was entitled to qualified immunity. Jurnove, as a prevailing defendant, appeals from the denial of attorneys' fees and costs. Panetta does not cross-appeal from the denial of her motion for a new trial on damages.

We hold that Crowley had probable cause to arrest Panetta because he relied on the complaints of a purported peace officer as well as an identified citizen informant, and he corroborated these complaints with personal observations. Crowley was entitled to judgment as a matter of law, and we vacate the judgment against him. However, we affirm the denial of attorneys' fees and costs to Jurnove.

## BACKGROUND

a) *Facts*

We of course view the evidence in the light most favorable to Panetta. *United* *States v. Space Hunters, Inc.*, 429 F.3d 416, 428–29 (2d Cir.2005).

On April 17, 1998, Marc Jurnove and Patricia Kelvasa made a walk-in complaint to New York State Trooper Crowley at the Middletown, New York, State Police barracks. They alleged that Sylvia Panetta was abusing her horse, Veil. During a 10 to 15 minute conversation, Jurnove and Kelvasa detailed their basis for suspicions of animal cruelty. They stated that Veil had hair loss; lice; scabbing; protrusion of ribs, top line, and hips; bloated belly; patchy skin; and cracked hooves, all of which they claimed was evidence that the horse was not properly cared for or provided proper food. Jurnove and Kelvasa also showed Crowley a series of recent photographs taken by Kelvasa, depicting several of the physical maladies they had described. During this meeting, Crowley, who had no previous experience with horses, asked Jurnove and Kelvasa additional questions about Veil, general horse care, and signs of neglect.

While Crowley lacked training with respect to horses, Jurnove and Kelvasa represented themselves as having expertise in horse care. Jurnove informed Crowley that he had served as the chief cruelty investigator of the Long Island Humane Society, as an agent in the special investigations unit of the American Society for the Prevention of Cruelty to Animals, and as a director of the International Society for the Protection of Exotic Animal Kind & Livestock ("I-SPEAK"). Jurnove also represented that he had received advanced equine training and was certified in evaluating the physical status of horses, including body weight and hoof conditions. Furthermore, Jurnove provided Crowley with a written statement indicating that he was a "NY State Peace Officer" or simply a

"Peace Officer" in connection with some of the positions described above. Kelvasa based her equine credentials on her service as a co-leader of a 4–H program, in which she instructed children in the care, feeding, and treatment of horses, as well as her personal ownership of horses.

Jurnove also provided Crowley with a seven-page written statement, supplied on I–SPEAK letterhead, describing Veil's condition. The written statement was intended to support Jurnove's belief that Veil was being kept in violation of the animal cruelty laws, specifically New York Agriculture and Markets Law § 353. After listing Jurnove's animal protection credentials, the written statement describes Jurnove's 1995 observations of Veil and his attempts to aid the horse. The last page of the written statement recounted Kelvasa's contacting of Jurnove about Veil's poor condition, Jurnove and Kelvasa's visit with Veil the next day, and the horse's present distressed state. The written statement concluded with the sentence: "I understand any false statement is a Class A misdemeanor by New York State Law." While Jurnove's written statement indicated his prior involvement with Veil in 1995, Jurnove did not inform Crowley that Panetta had previously sued him unsuccessfully for malicious prosecution stemming from Jurnove's 1995 actions.

After receiving the information provided to him by Jurnove and Kelvasa,[1] Officer Crowley and another officer researched the applicable law, New York Agriculture and Markets Law § 353. That provision makes it a misdemeanor to "deprive[ ] any animal of necessary sustenance or drink, or neglect[ ] or refuse[ ] to furnish it with

such sustenance or drink, or ... permit[ ] any animal to be unjustifiably injured." N.Y. Agric. & Mkts. Law § 353. Returning to Jurnove and Kelvasa, Crowley informed them that he was "not gonna just go out there, [and] arrest [Panetta] on your statement," but rather he would "investigate and take it from there."

b) *Crowley's Observation of Veil*

Following his meeting with Jurnove and Kelvasa, Crowley proceeded to view Veil for himself. Upon his arrival at Panetta's property, Crowley spoke with a man standing diagonally across the street and confirmed that he was at the correct address. Crowley also inquired whether the man knew anything about horses, and, when he received a positive response, asked the man's impression of the horse. The man told Crowley that Veil appeared to be in poor condition and also warned him to beware of the many dogs on Panetta's property.

Following this conversation, Crowley observed Veil for approximately five minutes from a fence line. From a distance of fifteen to twenty feet, Crowley confirmed many of Veil's maladies, including the protruding ribs and topline, a bloated belly, patchy skin, and cracked hooves. Crowley decided to issue Panetta an appearance ticket, which constitutes non-custodial arrest and requires the issuee to appear in court at a specified time. *See* N.Y.Crim. Proc. Law § 150.20 (outlining the procedure for the use of appearance tickets in specific circumstances); N.Y. Agric. & Mkts. Law § 371 (permitting use of appearance tickets for violations of animal cruelty laws).

---

**1.** Later the same evening, Kelvasa, with the help of another officer, reduced her oral complaint about Veil to writing. The written statement signed by Kelvasa concludes with a "Notice" of "Penal Law § 210.45" that "any

person who knowingly makes a false statement which such person does not believe to be true committed a crime under the laws of the state of New York punishable as a Class A Misdemeanor."

### c) *Panetta's Arrest*

Although the accounts of Panetta's arrest differ, we recount the evidence in the light most favorable to Panetta. *See Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir.2000).

Crowley drove his marked police car up Panetta's driveway. Panetta was standing on her deck speaking with another woman, Margaret Bernard, who was there to breed her rottweiler with Panetta's stud dog. As Crowley, dressed in uniform, exited the car, Panetta asked if she could help him. Crowley responded by asking twice whether any dogs were loose. After Panetta assured him that the dogs were secured, Crowley informed Panetta that he was arresting her. Panetta asked, "for what?" and Crowley replied, "Animal cruelty ... for the horse." Panetta asked how Crowley could arrest her for animal cruelty "when the horse is under a veterinarian's care?" Crowley allegedly replied that he did not care. Panetta then asked Crowley if he had a search warrant or a written or verbal complaint, and Crowley said that he did not; Crowley said that he had just been driving by and saw the horse. When Panetta asked what Crowley thought was wrong with the horse, he replied, "Well, look at her." Panetta retorted, "I did, that's why I called my vet, you know, why don't you call him?" Crowley declined to call the veterinarian and handcuffed Panetta.

After Panetta's arrest, she asked to go in the house for her purse and medications, but Crowley would not let her. Panetta repeated several times that the horse was seeing a vet, but Crowley either did not answer or said he did not care. Moreover, Crowley did not ask any questions about the horse.

Around this time, Gil Brandt, who lived with Panetta, approached and asked how Crowley could arrest her if the horse was under a veterinarian's care. Crowley replied that he did not care. After commenting that this situation reminded him of the Gestapo where people are taken from their homes for no reason at all, Brandt coughed and spit on the ground. Crowley, believing Brandt spit at him, handcuffed Brandt and arrested him for disorderly conduct. Crowley put Brandt in the police car, and Panetta, realizing that nobody would be left at home, began pleading to be allowed to put the mating dogs away and take care of a sick dog before she left. Crowley refused and put her in the car with Brandt.

While driving toward the police barracks, Panetta remembered that she left the stove on and asked to return to her house to turn it off. Despite her pleas, Crowley kept driving for a while before turning around and going back to the house. Crowley asked Panetta, "if I take you back to your house, do you promise you're going to turn the stove off?" Panetta told Crowley that she would "turn the stove off ... give the woman back her dog ... put [her] stud dog back in the house and ... take the sick dog and bring him into the house." When they returned to the house, Panetta entered the house, turned off the stove, and brought in her sick dog. Panetta, however, also called her veterinarian and brought the phone to Crowley, informing him that her "vet ... wants to talk to you." Crowley responded, "you promised you were just going to turn off the stove." Crowley then took the phone, disconnected it, put Panetta in the car, and resumed the trip to the police barracks.

Panetta was issued an appearance ticket for animal cruelty in violation of New York Agriculture and Markets Law § 353. The charge was later dismissed based on Panetta's veterinarian's affidavit that when he saw Veil on April 16, 1998, she was "in

reasonably good health considering her age" and that there "was no indication of a lack of care on the part of Ms. Panetta."

### d) District Court Decision

Panetta brought the present action against Crowley, Jurnove, and Kelvasa. Against Crowley she alleged false arrest and excessive force. She also claimed that Jurnove and Kelvasa engaged in malicious prosecution and conspired with the police to subject her to false arrest. Panetta voluntarily dismissed the claims against Kelvasa. All claims but the conspiracy count survived motions for summary judgment. The jury found Crowley liable on the false arrest claim but not on the excessive force claim. It awarded $1,000 in punitive damages but no compensatory or nominal damages. The jury found Jurnove not liable on the malicious prosecution claim.

Panetta moved for a new trial on damages and for attorneys' fees and costs; Crowley moved for judgment as a matter of law under Rule 50(b) or for a new trial under Rule 59(a); and Jurnove moved for attorneys' fees and costs as a prevailing defendant under 42 U.S.C. § 1988. Judge Yanthis granted Panetta's motion for fees ($48,577.75) and costs ($2,316.28) and denied all other motions.

Crowley argues that he was entitled to judgment as a matter of law because he had probable cause to arrest Panetta. In the alternative, Crowley contends that he was entitled to qualified immunity. Crowley also claims that, in any event, there was no evidence to support a punitive damages award. Jurnove argues that he is entitled to attorneys' fees and costs. Panetta does not cross appeal the denial of a new trial on damages.

## DISCUSSION

We review the denial of a motion for judgment as a matter of law de novo, applying the same standard applied by the district court. *Diesel*, 232 F.3d at 103. Thus, we view the evidence in the light most favorable to the prevailing party and draw all reasonable inferences in her favor. *Id.* Judgment as a matter of law is appropriate if no reasonable factfinder could have viewed the evidence as supporting the plaintiff's claim. *Malik v. Carrier Corp.*, 202 F.3d 97, 103 (2d Cir.2000).

### a) Probable Cause

New York Agriculture and Markets Law § 353 is to be enforced principally by police officers; however, agents and officers of incorporated societies for the prevention of cruelty to animals have a role as well. Specifically, Section 371 confers peace officer status on "agents or officers of any duly incorporated society for the prevention of cruelty to animals," N.Y. Agric. & Mkts. Law § 371, and such individuals "may" issue appearance tickets to "any person offending against" Section 353. *Id.* They may also make complaints of Section 353 violations to a court, tribunal, or magistrate. *Id.* Finally,

[u]pon complaint under oath or affirmation to any magistrate authorized to issue warrants in criminal cases, that the complainant has just and reasonable cause to suspect that [*inter alia*, Section 353 is] being or about to be violated in any particular building or place, such magistrate shall immediately issue and deliver a warrant to any person authorized by law to make arrests for such offenses, authorizing him to enter and search such building or place, and to arrest any person there present found violating any of said laws....

*Id.* § 372.

Before deciding whether Crowley is entitled to qualified immunity, we must de-

cide whether Panetta "has alleged a constitutional violation at all." *Kerman v. City of New York,* 261 F.3d 229, 235 (2d Cir. 2001) ("When determining whether qualified immunity protects an official, we must first determine whether the plaintiff has presented facts which, if proven, demonstrate that the defendant violated a constitutional right.") (internal quotations and citations omitted). Panetta cannot recover for false arrest if Crowley had probable cause to arrest her.

■ Probable cause requires an officer to have "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Martinez v. Simonetti,* 202 F.3d 625, 634 (2d Cir. 2000) (citation omitted). "When determining whether probable cause exists courts must consider those facts *available to the officer* at the time of the arrest and immediately before it," *Caldarola v. Calabrese,* 298 F.3d 156, 162 (2d Cir.2002) (emphasis supplied), as "[p]robable cause does not require absolute certainty." *Boyd v. City of New York,* 336 F.3d 72, 76 (2d Cir.2003). Courts should look to the "totality of the circumstances" and "must be aware that probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Caldarola,* 298 F.3d at 162 (citation omitted). Nevertheless, an officer may not disregard plainly exculpatory evidence. *Kerman,* 261 F.3d at 241 (citing *Kuehl v. Burtis,* 173 F.3d 646, 650 (8th Cir.1999)).

■ When making a probable cause determination, police officers are "entitled to rely on the allegations of fellow police officers." *Martinez,* 202 F.3d at 634; *see also Caldarola,* 298 F.3d at 166–67 (citing *Bernard v. United States,* 25 F.3d 98, 102–03

(2d Cir.1994)). "Absent significant indications to the contrary, an officer is entitled to rely on his fellow officer's determination that an arrest was lawful." *Loria v. Gorman,* 306 F.3d 1271, 1288 (2d Cir.2002). "[T]he determination of probable cause does not turn on whether [the fellow agent's] observations were accurate, but on whether [the arresting agent] was reasonable in relying on those observations." *Bernard,* 25 F.3d at 103.

■ Moreover, information gleaned from informants can be sufficient to justify the existence of probable cause. "[I]t is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness," *Martinez,* 202 F.3d at 634 (citation omitted), unless the circumstances raise doubt as to the person's veracity, *Singer v. Fulton County Sheriff,* 63 F.3d 110, 119 (2d Cir.1995). The reliability or veracity of the informant and the basis for the informant's knowledge are two important factors. *Caldarola,* 298 F.3d at 162. "[A] tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated" is especially significant in establishing probable cause. *Florida v. J.L.,* 529 U.S. 266, 270, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000). Moreover, information provided by "an identified bystander with no apparent motive to falsify" has "a peculiar likelihood of accuracy," *Caldarola,* 298 F.3d at 163 (citation omitted), and we have endorsed the proposition that "an identified citizen informant is presumed to be reliable." *Id.* at 165.

■ Furthermore, "[t]he fact that an innocent explanation may be consistent with the facts alleged ... does not negate probable cause," *United States v. Fama,* 758 F.2d 834, 838 (2d Cir.1985), and an

officer's failure to investigate an arrestee's protestations of innocence generally does not vitiate probable cause. In *Curley v. Village of Suffern*, 268 F.3d 65 (2d Cir. 2001), we held that when a purported assault victim who was visibly injured told a police officer that Curley had assaulted him, the officer had probable cause to arrest Curley, despite Curley's conflicting account. *Id.* at 70. We said that:

[O]nce a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest.

Although a better procedure may [be] for the officers to investigate plaintiff's version of events more completely, the arresting officer does not have to prove plaintiff's version wrong before arresting him. Nor does it matter that an investigation might have cast doubt upon the basis for the arrest. Before making an arrest, if the arresting officer has probable cause, he need not also believe with certainty that the arrestee will be successfully prosecuted.

*Id.* (internal quotation marks and citations omitted). We have also noted that "[o]nce officers possess facts sufficient to establish probable cause, they are neither required nor allowed to sit as prosecutor, judge or jury. Their function is to apprehend those suspected of wrongdoing, and not to finally determine guilt through a weighing of the evidence." *Krause v. Bennett*, 887 F.2d 362, 372 (2d Cir.1989).

▮ When Crowley arrested Panetta— *i.e.*, when he first placed her into custody and began to transport her to the police barracks—Crowley had "reasonably trustworthy information," *Martinez*, 202 F.3d at 634 (citation omitted), that the horse was being denied sustenance or drink and/or was being unjustifiably injured in violation of New York Agriculture and Markets Law § 353. Thus, under the "totality of the circumstances" and considering those facts available to Crowley at the time of the arrest, *Caldarola*, 298 F.3d at 162, we conclude that Crowley had, as a matter of law, probable cause to arrest Panetta.

First, a reasonable officer could rely on the observations of Jurnove, who claimed to be a peace officer as defined in New York Agriculture and Markets Law § 371.[2]

**2.** Under New York law, the "peace officer" category includes individuals in a wide range of law-enforcement and quasi-law-enforcement roles; police officers are among them. See N.Y.Crim. Proc. Law § 2.10 (enumerating 80 categories of peace officers). As discussed above, under our precedent, a police officer is entitled to rely upon a fellow officer's determination that an arrest is lawful, so long as there are not "significant indications to the contrary." *Loria v. Gorman*, 306 F.3d 1271, 1288 (2d Cir.2002). We have never determined whether nonpolice peace officers should be treated like police officers for purposes of this rule. We have recognized that in some circumstances it may be appropriate for a police officer to give weight to the statements of a nonpolice peace officer without extensive inquiry into the peace officer's credentials or qualifications to assess probable

cause. In *Ricciuti v. N.Y.C. Transit Authority*, 124 F.3d 123 (2d Cir.1997), for example, we concluded that a police officer had had probable cause to arrest where he relied upon a corrections officer's claim that the arrestee had assaulted him. *Id.* at 128. We noted that the corrections officer had displayed signs of injury and that his account was "buttressed" by the fact that he had identified himself as a law enforcement officer. *Id.* But whether, in other circumstances, especially where time is not of the essence or where judgment and expertise are required to determine whether a crime has occurred, a police officer should take care to verify the purported peace officer's credentials and the basis for his or her assessment that a crime has occurred is not before us.

Jurnove's actual peace officer status under Section 371 was called into question, albeit

Jurnove's written statement claimed that he was a "director" of the "humane society I-SPEAK," an organization "Dedicated to the Welfare of All Displayed/Owned Exotic Animals & Livestock" since 1972. Moreover, the written statement described Jurnove's expertise in equine health and abuse evaluation and listed several other positions held by Jurnove in which he was denominated a "NY State Peace Officer" or simply "Peace Officer." Crowley was therefore justified in presuming the reliability of Jurnove's claim that "all animals seen need immediate attention." [3]

Furthermore, Jurnove's complaints were corroborated by Kelvasa, an identified citizen informant, whose knowledge of Veil's neglected state was based on her own personal observations. Not only does Kelvasa's status as an identified citizen informant provide an indicia of reliability, *Caldarola*, 298 F.3d at 165, but the fact that Jurnove and Kelvasa's descriptions of Veil were based on eyewitness accounts also carries additional weight in assessing the reasonableness of Crowley's probable cause determination, *Martinez*, 202 F.3d at 634. Crowley also received a series of recent photographs that substantiated Jurnove and Kelvasa's verbal and written statements. Finally, Jurnove's affidavit

and the written statement later produced by Kelvasa both contain acknowledgments that any false statements made to Crowley subjected the authors to criminal penalties. This exposure to criminal penalties is an additional factor supporting the reasonableness of Crowley's reliance on Jurnove and Kelvasa's complaints. *See Illinois v. Gates*, 462 U.S. 213, 233–34, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

Moreover, Crowley himself observed the horse and found that the descriptions of ailments and problems he had received from Jurnove and Kelvasa were accurate. *See Bernard*, 25 F.3d at 103 ("[The arresting officer] was reasonable in relying on [the fellow officer's] observations, particularly where they corresponded with [the arresting officer's] own observation."). Indeed, it was only after observing Veil for a full five minutes from a distance close enough to identify all of her maladies that Crowley determined that he had enough evidence to constitute probable cause for Panetta's arrest.

Panetta argues that despite the information at Crowley's disposal, he was required to further investigate the matter before arresting Panetta. Specifically, Panetta argues that Crowley ignored (or failed to inquire about) the horse's age, which might

---

not conclusively rebutted, at trial. The only issue before us, however, is whether Crowley was reasonable in relying on Jurnove's statement. There was no evidence that Crowley should have known that Jurnove lacked the proper authority or lied about his credentials as an authorized representative of I-SPEAK. Indeed, Jurnove's written statement was sworn under oath and contains a statement acknowledging his understanding of the penalties at law for any false statements made in the statement. Moreover, Jurnove's statement indicated that he had expertise relevant to his assessment of Veil's condition and that he had observed the horse personally. Thus, it was appropriate for Crowley to give weight to Jurnove's statement. Moreover, Crowley

engaged in further investigation of Veil's condition before deciding to arrest Panetta.

3. Panetta argues that, because Jurnove had lodged a complaint against her once before and been sued by her, Crowley should not be permitted to rely on Jurnove's complaints as a basis for probable cause. We disagree. These circumstances were not sufficient to render it unreasonable to give weight to Jurnove's complaint. As the Supreme Court stated in *Gates*, "even if we entertain some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles his tip to greater weight than might otherwise be the case." 462 U.S. at 234, 103 S.Ct. 2317.

have explained some of its symptoms. Panetta further contends that Crowley ignored her statements that the horse was under veterinary care, that she was properly caring for the animal, and that a phone call to her veterinarian would clear her of wrongdoing. Finally, Panetta argues that Crowley was wrong to refuse to speak to the horse's veterinarian when Panetta reached him on the phone after being returned to her house to turn off the stove.

 However, Crowley's decision not to heed Panetta's assertions that the horse was under veterinary supervision did not constitute a disregard for exculpatory evidence sufficient to eliminate probable cause. Crowley was not "required to explore and eliminate every theoretically plausible claim of innocence," *Curley*, 268 F.3d at 70, after confirming the presence of the abuse symptoms alleged by the complainants. Once an officer has probable cause, he or she is "neither required nor allowed" to continue investigating, sifting and weighing information. *Krause*, 887 F.2d at 372. Thus, he was not required to prove wrong Panetta's conflicting account of the horse's condition or to seek the advice of the veterinarian before effectuating the arrest. *See Caldarola*, 298 F.3d at 168 ("We consider only information [the officer] relied on in concluding that there was probable cause to arrest [the plaintiff]," not every theoretically plausible piece of exculpatory evidence or claim of innocence that might have existed.); *Krause*, 887 F.2d at 371 ("[P]robable cause does not require an officer to be certain that subsequent prosecution of the arrestee will be successful. 'It is therefore of no consequence that a more thorough or more probing investigation might have cast doubt upon' the situation.") (quoting *United States v. Manley*, 632 F.2d 978, 984 (2d Cir.1980)).

Panetta relies heavily upon *Kerman*, 261 F.3d 229, as demonstrating the unreasonableness of Crowley's decision to arrest Panetta. In *Kerman*, the police received an anonymous 911 tip that a mentally ill man was off his medication, acting crazily, and possibly had a gun. *Id.* at 232. The police entered Kerman's apartment without a warrant, but did not find a gun, did not observe any obstreperous behavior by Kerman, but ordered Kerman's involuntary hospitalization after hanging up on Kerman's psychiatrist. *Id.* at 236, 240–41.

We held that the officer in charge did not have qualified immunity from Kerman's false arrest claim because the investigation was not reasonable as a matter of law. *Id.* at 240–41. We noted that the 911 tip was not corroborated by the investigation: no gun was found, and Kerman acted calmly, not crazily. *Id.* at 240.

> Furthermore, the officers deliberately ignored two opportunities to confirm the seriousness of Kerman's condition. The police gave short shrift to [the anonymous 911 caller] when she called the apartment, and hung up on [Kerman's psychiatrist] without making any effort to ascertain whether Kerman presented a threat to himself or others.

*Id.* at 241. Because the officers "had the opportunity to consult a medical professional familiar with the patient's condition," the court could not "see the reasonableness of hanging up on a doctor in such a situation." *Id.*

However, *Kerman* is easily distinguishable. First, *Kerman* emphasized as a basis for its holding that the 911 tipster was anonymous and that the tipster's gun claims were known to be wrong when the arrest was made. *Id.* at 240–41. Crowley, however, acted on the complaints of two identified individuals—one of whom was a purported peace officer under the relevant statute—and corroborated the complaints

with his own observations of Veil. Second, the police in *Kerman* refused to talk to the psychiatrist before making their decision to seize Kerman and order his removal to a hospital. *Id.* at 241. In this case, Crowley hung up on the veterinarian only after having completed the arrest of Panetta, driving partway to the police barracks, and returning to the house only to permit Panetta to turn off her stove. Thus, Crowley's decision to hang up on the veterinarian after arresting Panetta is not analogous to the officer's decision in *Kerman* to hang up on the psychiatrist before seizing Kerman and sending him to the hospital.

Because we find that Crowley had probable cause to arrest Panetta after he confirmed Jurnove and Kelvasa's complaint, no constitutional violation occurred.

b) *Jurnove's Motion for Attorneys' Fees and Costs*

 Under 42 U.S.C. § 1988(b), in any action to enforce Section 1983, a district court, "in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." We review a grant or denial of section 1988 fees for abuse of discretion. *LeBlanc–Sternberg v. Fletcher*, 143 F.3d 765, 770 (2d Cir.1998). Fees are regularly awarded to prevailing plaintiffs who obtain some significant measure of relief but not to prevailing defendants. *See, e.g., Hughes v. Rowe*, 449 U.S. 5, 15–16, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (per curiam). Instead, "a plaintiff should not be assessed his opponent's attorney's fees unless a court finds that his claim was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so." *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 422, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978). A prevailing defendant need not show bad faith by a plaintiff to be entitled to attorneys'

fees, though such a showing provides "an even stronger basis" for the award. *Id.*

 The district court's denial of attorneys' fees to Jurnove was not an abuse of discretion. Panetta's claim against him for malicious prosecution had some basis in fact. Jurnove complained to the police about Veil; he had complained unsuccessfully in the past; and he knew of Veil's advanced age yet failed to discuss the possible relevance of this fact with the police. Panetta's conspiracy claim, though perhaps very thin, was not frivolous because of the understandably curious, at least from Panetta's perspective, sequence of events: Jurnove complained to Crowley; Crowley arrested Panetta; and Jurnove was at the police station when she arrived. Furthermore, after the conspiracy claim was dismissed, Panetta did not attempt to continue litigating it.

## CONCLUSION

For the reasons above, Crowley had probable cause to arrest Panetta and thus was entitled to judgment as a matter of law. We therefore vacate the judgment against Crowley. We affirm the denial of attorneys' fees and costs to Jurnove.

We thank the amicus curiae for the brief in this case.