Gerhard SEITZ, and Joan
Seitz, Plaintiffs,

v.

Paul DeQUARTO, Individually & as an Employee of the New York State Police, Theresa Andryshak, Individually & as an Employee of the New York State Police, and New York State Police, Defendants.

No. 08 Civ. 1537(WGY).

United States District Court, S.D. New York.

Jan. 6, 2011.

Marsha Solomon Weiss, Feldman, Kleidman & Coffey, LLP, Fishkill, NY, for Plaintiffs.

Donald Nowve, Frederick Hongyee Wen, Attorney General of the State of New York, New York, NY, for Defendants.

## MEMORANDUM AND ORDER

WILLIAM G. YOUNG, District Judge.[1]

## I. INTRODUCTION

Gerhard and Joan Seitz (collectively, the "Seitzes") seek damages from the New York State Police (the "State Police") and New York State Police Investigators Paul DeQuarto and Theresa Andryshak (collectively, the "Investigators"), in their individual and official capacities (all together, the "Defendants"). Mr. Seitz advances a claim under 42 U.S.C. Section 1983 for violations of his rights under the Fourth and Fifth Amendments, and state common law claims for false arrest, unlawful imprisonment, and malicious prosecution. Ms. Seitz makes a derivative claim for the damages resulting from her husband's allegedly false arrest. The Seitzes claim that when the Defendants arrested Mr. Seitz, they had neither a warrant nor probable cause, thereby violating his Fourth Amendment right to be free from unreasonable seizure.

The Defendants moved for summary judgment on each of the Seitzes' claims. The State Police claims that, as a state entity, it is immune from suit under the Eleventh Amendment. The investigators likewise claim entitlement to immunity in their official capacities. The Investigators further argue that they have qualified immunity from suit because they had "arguable" probable cause, meaning that they were objectively reasonable in their belief that their conduct did not violate Mr. Seitz's constitutional rights, or that they had actual probable cause, meaning there was no constitutional violation at all. The Defendants also allege that the Seitzes improperly pled the Fifth Amendment due process claim. Finally, the Defendants urge this Court to decline to exercise supplemental jurisdiction over the state law claims if it holds that qualified immunity bars the Section 1983 claim.

## II. Factual Background

As required on motions for summary judgment, this factual summary consists of undisputed facts as to which the Seitzes bear the burden of proof and disputed facts in the light most favorable to the Seitzes, the non-moving parties. The Court reviews the record as a whole, but "it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Accordingly, on any issue on which the moving parties bear the burden of proof—here the issue of qualified immunity—the Court will disregard evidence in favor of the moving parties—even if uncontradicted—that the jury would be free to disbelieve.[2] *See id.*

---

**1.** Of the District of Massachusetts, sitting by designation.

**2.** This approach is obviously in tension with Local Rule 56.1(c) which, like many districts' local rules, expressly provides:

Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion [for summary judgment] unless specially controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party. S.D.N.Y. R. 56.1(c) (emphasis omitted).

As a visiting judge, I am, of course, bound by the S.D.N.Y. Local Rules. Still, the ap-

proach set out above appears mandated by Supreme Court precedent.

Fortunately, resolution of this tension is not outcome-determinative in this case. Nevertheless, it is appropriate to observe that use of this "point-counterpoint" system has a tendency, wherever the moving party bears the burden of proof, to shift to the non-moving party a burden of production inconsistent with the law's allocation of the burden of proof.

Today, in the wake of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), and *Ashcroft v. Iqbal*, —— U.S. ——, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), I am reminded of Judge Patricia M. Wald's prescient comments made a dozen years ago:

> [I]t seems clear that summary judgment gives judges more opportunities and power to make law.... My review of the D.C. Circuit's summary judgment rulings over a six-month period suggests that judges will stretch to make summary judgment apply even in borderline cases which, a decade ago, might have been thought indisputably trial-worthy. It also suggests that appellate courts will, by and large, uphold these dispositions, unless they think the trial judge got the law wrong. The upshot is that only plaintiffs who can put together strong cases without conducting discovery have a clear shot at reaching trial. Their pleadings must (notwithstanding the permissive language of Rule 6) provide factual evidence sufficiently detailed to enable them to withstand motions to dismiss or for judgment on the pleadings or for summary judgment. Discovery, despite Rule 56(f), may be withheld, unless they can justify it in terms of the likelihood that it will yield crucial evidence.
>
> None of this sounds or feels like what the Federal Rules of Civil Procedure say.... Rough justice may well be taking place in the corner-cutting practice I have described—the system may be surviving by weeding out marginal cases that would exact from the courts as well as the litigants costly and useless resources if permitted to go to trial. But that judgment ought to be made more openly, by changes to Rule 56, rather than covertly.
>
> And one must at least think about the implications of the new regime, in which law is mostly made on the basis of undisputed facts "pleaded," "stipulated," or "inferred" rather than on fuller trial records that may more accurately represent the complexity and ambiguity of life. will our law be less sensitive to the multivalenced and perspectival qualities of human events? Will our jurisprudence craft rules and principles and hand them down fully formed from the netherworld of law school hypotheticals, instead of forging them in the heat of pitched battle and hammering them into shape on the anvil of trials, witnesses, cross-examinations, and live evidence evaluated by ordinary lay persons? Will our law come to be characterized more by clear directives than by the balancing formulas so deplored by academics, but arguably superior in their ability to effect justice in the individual cases?
>
> ....
>
> Ironically, as more cases are resolved by summary judgment, more law is created, because fewer cases will exit the system by reason of the plaintiff's inability to show the facts necessary to entitle them to a legal remedy under existing law.... The disposal of cases without trial ends the *cases* quickly, but creates *law* which persists.... [J]udges need not even explain their reasons for granting summary judgment (though most do), even though they must provide findings of fact and conclusions of law in bench trials. The more reflexively summary judgment is used, the less the goal of discovering the truth—or even the reality—of particular disputes remains at the forefront of the civil litigation process. The name of the game in the emerging no-trial regime is quickly amassing enough evidence to support a legal theory on summary judgment.
>
> Another ironic implication of the spread of summary judgment is that, even as our law enjoys a growth spurt quantitatively, it is enfeebled from growing in a more meaningful, qualitative sense. With summary judgment ruling the roost, the prototypical mode of lawmaking involves applying legal principles to incomplete, often anemic, factual scenarios. The complexity of real-life situations, which require judges to recognize the ways in which existing legal principles may not account for the multifarious possibilities of life—and accordingly to adjust or temper the law as necessary—risks going by the book. If Oliver Wendell Holmes was right when he said that "[t]he life of the law has not been logic: it has been experience," then the decoupling of law from experience could strike a mortal blow to its integrity; our law would not disappear/ but it could become lifeless, like a whale washed up on the beach.

Around 5:20 p.m. on February 12, 2006, a white male with a (possibly fake) bushy mustache wearing a blue baseball cap and a dark jacket stole several thousand dollars worth of watches from a Gander Mountain store in Wallkill, New York. Defs.' Statement Pursuant Local Rule 56.1 ¶¶ 1, 16, ECF No. 24 ("Defs.' SOF"); Pls.' Counterstatement Pursuant Local Rule 56.1 ¶ 16, ECF No, 29–1 ("Pls.' SOF"). Multiple Gander Mountain employees witnessed the theft and the suspect fleeing the store; a video surveillance camera also captured images of the crime. Compl. ¶¶ 11–12, ECF No. 1. The suspect fled in a "red Toyota pickup truck with a white cap and white bumper sticker." *Id.* ¶ 12. Gander Mountain employees called the State Police to investigate, and State Police Trooper Andrew Stack responded to the call. *Id.* ¶ 13; Defs.' SOF ¶ 9. Stack took statements from three Gander Mountain employees: Caitlin Bernstein, Paul Blessington, and Mark Dombrowski. Defs.' SOF ¶ 12.

After receiving a phone call from Trooper Stack, DeQuarto responded to Gander Mountain around 5:30 p.m. Defs.' SOF ¶¶ 9–10. Bernstein told DeQuarto that she had observed the suspect near the watch counter, and when she asked if he needed help, he said no and left the store. *Id.* ¶ 15. Bernstein described the suspect and his getaway vehicle, then provided that day's surveillance footage to DeQuarto. *Id.* ¶¶ 16–18. DeQuarto asked Bernstein to review previous store surveillance footage to see if she recognized the suspect in previous store visits, *Id.* ¶ 21. DeQuarto also spoke with Katlyn Storms, the employee who saw the suspect place watches in his pocket. *Id.* ¶ 24, Storms's physical description of the suspect matched Bernstein's, and Blessington's statement further corroborated the description. *Id.* ¶ 24, 27.

When DeQuarto reviewed the surveillance footage, he confirmed Bernstein's physical description of the suspect. *See* Pls.' SOF ¶ 19. On February 13, Bernstein left DeQuarto a voicemail indicating that the surveillance footage from February 10 may have captured an image of the same man, or someone who looked similar.

Patricia M. Wald, *Summary Judgment at Sixty*, 76 Tex. L. Rev. 1897, 1942–44 (1998) (footnotes omitted).

This dire state of affairs is exacerbated in cases in which judicially crafted doctrines—such as qualified immunity—intersect with summary procedures to eviscerate further the role of fact-finding in litigation and adjudication. *See* Goutam U. Jois, Pearson, Iqbal, *and Procedural Judicial Activism*, 37 Fla. St. U.L. Rev. 901, 901 (2010) ("*Iqbal* takes away the district court's ability to manage litigation (by using procedures explicitly provided in the Federal Rules and previously approved by the U.S. Supreme Court) in order to shield public officials, relying instead on the rather blunt instrument of dismissing the case entirely."); *id.* at 943 ("*Iqbal* restricts courts' discretion to carefully manage litigation, thus forcing them to dismiss claims outright when in the past some targeted or limited discovery might have preserved the claims.").

Regrettably, those of us in the judiciary appear not to be getting the message—or we don't care. *See* Arthur Miller, *From* Conley *to* Twombly *to* Iqbal; *A Double Play on the* Federal Rules of Civil Procedure, 60 Duke L.J. 1 (2010); Arthur Miller, *The Pretrial Rush to Judgment: Are the "Litigation Explosion," "Liability Crisis," and Efficiency Cliches Eroding Our Day in Court and Jury Trial Commitments?*, 78 N.Y.U. L. Rev. 982 (2003); William G. Young, *A Lament for What Once Was and Yet Can Be*, 32 B.C. Int'l & Comp. L. Rev. 305, 312–18 (2009); *see also* D. Brock Hornby, *Summary Judgment Without Illusions*, 13 Green Bag 2d 273, 288 (2010). ("[W]hen in doubt on facts or their inferences, judges should 'just say no.' ")

I've reached the conclusion that the eclipse of fact-finding foreshadows the twilight of judicial independence. Nevertheless, I am sworn to soldier on and apply the law of the Supreme Court and the Second Circuit to the undisputed facts in this record.

Dep. Caitlin Bernstein, Ex. P, ECF No. 25–3. The next day, DeQuarto retrieved and reviewed a CD containing the February 10 surveillance footage from Gander Mountain; Andryshak did not view the CD. Defs.' SOF ¶¶ 33–34; Pls.' SOF ¶ 102. The February 10 footage showed the identified man paying for his purchase with a credit card, so DeQuarto traced the credit card information and learned the card belonged to Ms. Seitz. Defs.' SOF ¶¶ 37–38. DeQuarto used the Department of Motor Vehicles database to learn Ms. Seitz's address. *Id.* ¶ 39. He noted that no pickup truck matching the getaway vehicle's description was registered to the Seitzes. *Id.*

The Investigators went to the Seitzes' home at 5:30 p.m. on February 15.[3] *Id.* ¶ 40. When Mr. Seitz answered the door, the Investigators identified themselves and asked Mr. Seitz to accompany them to the police station to discuss an incident at Gander Mountain. *Id.* ¶¶ 41–42; Pls.' SOF ¶ 42. Mr. Seitz declined to go with the Investigators, but he allowed them to enter his home to discuss the incident. Defs.' SOF ¶ 46. DeQuarto described Mr. Seitz's physical appearance as a light-skinned man in his forties, height around 5′8″ or 5′9″, medium build, with a dark bushy mustache and about a quarter inch of facial hair underneath his lower lip. Dep. Paul DeQuarto 174:5–16, Ex. Y, ECF No. 25–4.

Once inside, the Investigators saw a denim flannel-print shirt on a chair in Mr. Seitz's kitchen. Defs.' SOF ¶ 47. They believed this shirt matched the one visible in the February 12 surveillance video. *See* Photographs, Exs. L–M, ECF No. 25–2 (depicting the suspect on the day of the larceny). Mr. Seitz told the investigators that he drove a green pick-up truck owned by his employer, but that the Seitzes owned no red pick-up truck; DeQuarto observed a green pick-up truck with no bumper stickers in the Seitzes' driveway. Defs.' SOF ¶¶ 49–50.

When asked whether he had ever been arrested, Mr. Seitz denied previous arrests until DeQuarto prompted him about his arrest in Texas in the 1980s. *Id.* ¶ 51. The Investigators also asked Mr. Seitz if he had ever been to Gander Mountain; he replied that he was there often and very recently and produced receipts from recent purchases made at the store. *Id.* ¶¶ 52–53.

The Investigators then showed Mr. Seitz a photograph taken from the February 10 surveillance footage; Mr. Seitz acknowledged that he was depicted shopping in that photograph. *Id.* ¶ 54; Pls.' SOF ¶ 54. When shown the still image taken from the February 12 surveillance footage, however, Mr. Seitz denied that he was in the picture and showed DeQuarto that, unlike Mr. Seitz, the man in the image had no hair under his lip. Defs.' SOF ¶¶ 55–57. In response to questioning from the Investigators, Mr. Seitz stated that he wears neither watches nor baseball caps, and that he must have left his jacket at work. *Id.* ¶ 59–60. Mr. Seitz then asked the Investigators whether they were investigating a larceny of watches. *Id.* ¶ 61.

At that time, the investigators renewed their request that Mr. Seitz follow them to the police station; when he declined, they took his "pedigree information" and left. *Id.* ¶ 65. They did not ask Mr. Seitz whether he was present at Gander Mountain on February 12; whether he stole watches on that day or had information about that theft; or whether he owned a red pick-up truck. *Id.* ¶ 66. Nor did they inquire whether Mr. Seitz's employer

---

**3.** The parties agree that Mr. Seitz looked the same when DeQuarto and Andryshak visited his home as he did in the February 10 surveillance footage.

owned a red pick-up truck. Pls.' SOF ¶ 106.

Andryshak conducted about an hour of surveillance of the parking lot at Mr. Seitz's employer on the following morning. Dep. Theresa Andryshak 77:23–79:6, Ex. Z, ECF No. 25–5. She saw Mr. Seitz arrive, driving a green pick-up truck and wearing a dark jacket. *Id.* 83:4–84:16. Andryshak noted the inconsistency between Mr. Seitz's prior statement that he had left his jacket at work and his arrival at his place of employment wearing the same jacket. *Id.* 87:13–23. Later that day, Assistant District Attorney David Huey assisted the Investigators in writing a search warrant application for the Seitz's home. Defs.' SOF ¶ 77. Town Justice John Goldsmith reviewed the application and authorized the search warrant. *Id.* ¶ 79.

At about 2:40 p.m. on February 16, before the search warrant was executed, the Investigators and two State Police troopers arrested Mr. Seitz at work for third-degree grand larceny. *Id.* ¶¶ 80, 83. The decision to arrest Mr. Seitz had been made jointly by Andryshak and DeQuarto before the search warrant was authorized. *Id.* ¶ 81. Mr. Seitz was then transported to the police station for processing and arraignment.[4] *Id.* ¶ 82.

Around 3:00 p.m., Andryshak and other State Police employees executed the search warrant at the Seitzes' home, where they recovered both the denim flannel shirt and the Gander Mountain receipts; the search turned up no baseball caps or proceeds of the larceny. Defs.' SOP ¶ 83;

Pls.' SOF ¶ 122. Andryshak saw a dark jacket in Mr. Seitz's truck, so DeQuarto and Huey impounded the vehicle while Andryshak sought and secured a search warrant from Town Justice Goldsmith. Defs.' SOF ¶ 84. On February 17, Andryshak recovered a blue, waist-length jacket from the green pick-up truck owned by Mr. Seitz's employer. *Id.* ¶¶ 84–85.

State Police Troopers Justin Skrapits and Michael Sumnick transported Mr. Seitz for arraignment in Wallkill, New York, before Justice Freehill, who set bail at $10,000, Defs.' SOF ¶ 88. Mr. Seitz was unrepresented by counsel at his arraignment, apparently because his attorney was told the arraignment would occur in Mount Hope. *Id.* ¶ 86. Mr. Seitz spent one night in the Orange County Jail before Me. Seitz posted bail on February 18, sometime between 2:00 and 3:00 p.m. *Id.* ¶ 91.

On March 2, in Wawayanda, New York, the Investigators observed the red pick-up truck described by the Gander Mountain witnesses; Bernstein confirmed this was the vehicle she had seen. *Id.* ¶ 96. The truck was driven by Wlodzimirz Fronc; when DeQuarto executed a search warrant in Fronc's home, he discovered the stolen watches. *Id.* ¶ 97. Fronc confessed to the theft and was subsequently arrested. *Id.* Assistant District Attorney John Polinsky informed Mr. Seitz's lawyer that another individual had been arrested for the same crime, and the State dropped the charge against Mr. Seitz on March 8, 2006. *Id.* ¶¶ 99–100.

---

4. Mr. Seitz alleges that the Investigators did not advise him of his *Miranda* rights, and did not provide him with an opportunity to contact a friend or loved one. Pls.' SOF ¶ 82; Compl. ¶¶ 27–28. Mr. Seitz claims that he invoked his right to counsel after arrest but was not allowed to call his attorney because the State Police feared he would contact

someone to destroy evidence of the crime. Pls.' SOF ¶ 114. The State Police seized his key chain and threatened to shoot Mr. Seitz's dog upon execution of the search warrant. *Id.* ¶¶ 115–116. Mr. Seitz was handcuffed to a chair in the police station for three to four hours. *Id.* ¶ 117; Compl. ¶ 26.

## III. Analysis

### A. Motion for Summary Judgment

The Court may award summary judgment when no genuine issues of material fact exist and the moving party is entitled to judgment as matter of law. Fed. R.Civ.P. 56(c)(2). The moving party bears the initial burden of demonstrating that there are no genuine issues of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In reviewing the parties' evidence, this Court must "resolv[e] all ambiguities and draw [ ] all permissible factual inferences in favor of the party against whom summary judgment is sought." *Burg v. Gosselin*, 591 F.3d 95, 97 (2d Cir.2010) (quoting *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir.2009)).

### B. Sovereign Immunity

■■■ The United States Constitution limits the power of the federal judiciary/ such that it "shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Generally, the Eleventh Amendment prevents damages actions against states in federal court unless and until the state waives its immunity. *Kentucky v. Graham*, 473 U.S. 159, 169, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). The Eleventh Amendment further shields state officials from liability when they act in their official capacities, because the true party in interest is the state, not the official. *See id.* at 167, 105 S.Ct. 3099.

■■■ The Supreme Court has held that Congress did not intend to abrogate sovereign immunity by enacting 42 u.S.C Section 1983. *Edelman v. Jordan*, 415 U.S. 651, 674–77, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). Indeed, the Eleventh Amendment bars Section 1983 damages suits against both state governmental bodies and officials. *See id.* at 676–77, 94 S.Ct. 1347. Thus, both the State Police (a governmental subunit of the State of New York) and the Investigators, in their official capacities, are immune from the Seitzes' suit. The Constitution forbids the prosecution of these claims against the State and its officials.

### C. Legal Standards: Qualified Immunity, False Arrest, & Malicious Prosecution

■■■ Sovereign immunity does not, however, *automatically* shield DeQuarto and Andryshak in their individual capacities. The Seitzes allege several causes of action against the Investigators, including (1) denial of Mr. Seitz's Fourth, Fifth,[5] and Fourteenth Amendment rights under 42 U.S.C. § 1983; (2) false arrest and unlawful imprisonment; (3) malicious prosecution; and (4) Ms. Seitz's derivative claim for the false arrest, unlawful imprisonment, and malicious prosecution of Mr. Seitz.[6] The Investigators may be entitled to qualified immunity from these claims.

---

**5.** The Defendants correctly point out that the Seitzes' Fifth Amendment due process claim must fail. Mem. Law Supp. Defs.' Mot. Summ. J. 22, ECF No. 26 ("Defs.' Mem."). The Fifth Amendment secures individual rights against the federal government, not against state government actors. *See Ambrose v. City of New York*, 623 F.Supp.2d 454, 466–67 (S.D.N.Y.2009). Moreover, the Seitzes declined to oppose the Defendants'

assertions regarding the Fifth Amendment claim. *See* Pls.' Mem. Opp'n Mot. Summ. J., ECF No. 29 ("Pls.' Mem.").

**6.** If Mr. Seitz's claims do not survive summary judgment, Ms. Seitz's derivative claim must be dismissed as well, as it is based on the same alleged constitutional and common law violations.

### 1. Qualified Immunity

■■ The Supreme Court has established that the state's sovereign immunity under the Eleventh Amendment extends to individuals acting in their roles as agents of the government. Individual state employees may claim qualified immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Courts are meant to conduct a two-part inquiry: did the plaintiff allege (1) "the deprivation of an actual constitutional right" that (2) was "clearly established at the time of the violation?" *Connecticut v. Gabbert,* 526 U.S. 286, 290, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999); *see also Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009) (establishing that courts need not perform these inquiries sequentially and permitting courts to evaluate either part first).

The Investigators claim they are entitled to qualified immunity because they arrest-ed Mr. Seitz with probable cause, meaning they did not deprive him of an actual constitutional right. Defs.' Mem. at 18–21. There is little question but that the allegedly violated right—the right to be free from warrantless arrest without probable cause under the Fourth Amendment—was a clearly established constitutional right at the time of Mr. Seitz's arrest in 2006. *See* U.S. Const. amend. IV. Thus, the absence of probable cause for Mr. Seitz's arrest could expose the Investigators to liability in this suit notwithstanding qualified immunity.

The Investigators alternatively argue that they are entitled to qualified immunity even if there was no probable cause to arrest Mr. Seitz if "it was objectively reasonable for them to believe their acts did not violate [Mr. Seitz's] rights." *Oliveira v. Mayer,* 23 F.3d 642, 648 (2d Cir.1994). The Supreme Court has held that qualified immunity attaches not only when the police officer acted reasonably and thus did not violate an established constitutional right, but also when he reasonably believed that his conduct did not violate that right.[7] *Anderson v. Creighton,* 483 U.S.

**7.** Some in the legal academy reject the logical "fallacy" in providing state officials two chances to establish reasonableness. David Rudovsky authored a mock dissenting opinion to *Saucier,* in which he opined that *Anderson* should be overruled and qualified immunity should be restricted to "those situations where a court decision finding the conduct to be unconstitutional was not fairly foreseeable by a reasonably trained officer." *David Rudovsky, Saucier v. Katz: Qualified Immunity as a Doctrine of Constitutional Rights, in We Dissent; Talking Back to the Rehnquist Court* 172, 179 (Michael Avery, ed., 2009). Rudovsky rejects the premise that the police are entitled to the opportunity to prove *either* that the force used was not excessive within the meaning of the offense (and was thus reasonable) *or* that it was objectively reasonable for the officer to believe his conduct was not unconstitutional. *Id.* at 177–79.

It is interesting to note, however, that not all litigants pursuing state and federal claims for excessive force are subject to the applica-bility of the *Saucier* analysis. For example, in Massachusetts, plaintiffs typically sue under both Section 1983 and the Massachusetts Civil Rights Act, Mass. Gen. L. c. 12, § 11H ("MCRA"). The MCRA is coextensive with Section 1983 so long as the plaintiff was deprived of a constitutional, federal, or state civil right via threat, intimidation, force, or coercion. *Sietins v. Joseph,* 238 F.Supp.2d 366, 377–78 (D.Mass.2003) (Dein, M.J.). In an excessive force case, the "force" element is part of both the claim of excessive force and eligibility for suit under the MCRA. As with claims under Section 1983 in federal courts, Massachusetts courts have judicially developed a defense of qualified immunity to actions brought under the MCRA. *Duarte v. Healy,* 405 Mass. 43, 48, 537 N.E.2d 1230 (1989). Massachusetts courts, however, have never expressly adopted the Supreme Court's *Saucier* analysis. So it is that in Massachusetts, little is made of *Saucier* since the MCRA affords the same relief as section 1983, and in cases involving alleged arrest without proba-

635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1967) ("The relevant question ... is the objective (albeit fact-specific) question whether a reasonable officer could have believed [the officer]'s warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed."); *see also Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (holding that a military police officer was entitled to qualified immunity from an excessive force suit when he objectively reasonably believed that he used reasonable force).

■ The second Circuit has referred to an officer's reasonable belief that his search or seizure was supported by probable cause, and thus constitutional under the Fourth Amendment, as "arguable probable cause." *Finigan v. Marshall*, 574 F.3d 57, 61 (2d Cir.2009). The *Finigan* court explained that arguable probable cause "requires that [the officer] show that it was objectively reasonable to believe that probable cause existed or that 'officers of reasonable competence could disagree on whether the probable cause test was met.'" *Id.* (quoting *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir.2004)). If no material facts are in dispute, it is the province of the court at the summary judgment stage to determine whether arguable probable cause existed at the time of arrest. *See Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir.2007).

Thus, the Investigators are entitled to qualified immunity if there is *either* (1) actual probable cause, or (2) arguable probable cause.

### 2. False Arrest and Unlawful Imprisonment Claim

■ Mr. Seitz's claim for false arrest is evaluated as a type of unlawful imprisonment claim, *see Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 116 (2d Cir.1995), thus his false arrest and unlawful imprisonment claims are subject to the same analysis. An unlawful imprisonment claim under New York state law requires the Seitzes to prove that "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994). Actual probable cause serves as a "complete defense" to the unlawful imprisonment and false arrest claims. *Id.* at 102.

### 3. Malicious Prosecution Claim

■ For a malicious prosecution claim, New York common law requires that litigants prove "(1) that the defendant initiated a prosecution against the plaintiff, (2) that the defendant lacked probable cause to believe the proceeding could succeed, (3) that the defendant acted with malice, and (4) that the prosecution was terminated in the plaintiff's favor." *Rohman v. New York City Transit Auth.*, 215 F.3d 208, 215 (2d Cir.2000). Here, the Court notes that the Seitzes failed specifically to allege facts that demonstrate malice on the part of the State Police or its Investigators.

### D. Arguable Probable Cause

■ The disposition of the federal claim in this case turns on the existence of actual or arguable probable cause for Mr. Seitz's arrest. "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illi-*

---

ble cause or excessive force, the claim necessarily implicates the "force" element required by the MCRA so courts routinely collapse the two to streamline the case for the jury.

In New York, however, *Saucier* appears alive and well and defendant officials can force plaintiffs to vault both hurdles.

*nois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The probable cause inquiry contemplates the totality of the circumstances. *Id.* at 233, 103 S.Ct. 2317. While the probable cause standard is not easily defined, it is clear that police officers need not be convinced beyond a reasonable doubt before making an arrest. *See Finigan,* 574 F.3d at 61–62. To demonstrate probable cause, the officers need show "only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Gates,* 462 U.S. at 243 n. 13, 103 S.Ct. 2317. The police must possess enough information about the facts and circumstances to allow a reasonable person to believe that the person committed an offense. *Panetta v. Crowley,* 460 F.3d 388, 395 (2d Cir.2006). The focus is on the information an officer possessed at the time of the arrest; events subsequent to Mr. Seitz's arrest cannot inform the reasonableness of the Investigators' conduct at the moment they arrested Mr. Seitz. *See id.*

 Upon the undisputed facts, this Court concludes as matter of law that reasonable police officers in the same position and possessed of the same knowledge as these Investigators would have reasonably believed that probable cause existed at the time of the arrest. Thus, the investigators had arguable probable cause to arrest Mr. Seitz, so they are entitled to qualified immunity on the Section 1933 claim against them.

First, DeQuarto and Andryshak relied on eyewitness descriptions of the suspect by Bernstein, Storms, and Blessington. Eyewitness descriptions are a valid foundation for probable cause, and here, the descriptions' reliability was bolstered by multiple matching eyewitness descriptions and a surveillance video. *See Martinez v. Simonetti,* 202 F.3d 625, 635 (2d Cir.2000). All three witnesses described a suspect who resembled Mr. Seitz: a white male, in his forties, with a bushy mustache, wearing a blue baseball cap and a dark jacket. In fact, Bernstein identified the video of Mr. Seitz shopping in Gander Mountain on February 10 as either the same or a very similar man.[8] Second, DeQuarto's investigation of the credit card transaction on February 10 led him to Mr. Seitz's home.[9]

Then too, Mr. Seitz asked whether they were investigating a watch larceny before

---

**8.** The Seitzes allege that Bernstein's information was incredible because Bernstein could not ascertain whether the mustache was fake or real. Pls.' Mem. 14–15, Bernstein's inability to tell whether the mustache was fake does not negate the presumption of credibility that is reserved for civilian crime victims who report criminal conduct to the authorities. *See Perez v. City of New York,* No. 07–Civ–10319, 2009 WL 1616374, at *5 (S.D.N.Y. June 8, 2009).

The Seitzes further claim that the Investigators' reliance on Bernstein's *identification* of (whom she believed to be) the suspect in the February 10 surveillance video footage was unreasonable because the Investigators failed to ask the other employee witnesses to verify her identification. Pls.' Mem. 15. While Storms and Blessington may have further corroborated or disagreed with the identification, the police are not required to exhaust all investigative steps to sustain a reasonable probable cause finding.

In sum, neither of these assertions undermines the reasonableness of the Investigators' probable cause determination when viewed in the totality of the circumstances.

**9.** There is evidence that DeQuarto concluded that the eyewitness descriptions matched the store's surveillance footage from both February 10 and 12 and that both Investigators believed that Mr. Seitz's appearance was very similar *to the witness descriptions* and the person or people depicted in the surveillance tapes. On the basis of their law enforcement experience, the Investigators believed that these facts militated toward Mr. Seitz's involvement in the larceny. This Court, however, has completely disregarded this evidence since the jury might disbelieve it. *See note 2, supra.*

DeQuarto or Andryshak told him they were seeking stolen watches. Mr. Seitz told the Investigators that he had never been arrested; the Investigators knew that he had been arrested in Texas, so he recanted his statement. The Investigators observed a shirt in Mr. Seitz's kitchen that they believed had been depicted in the February 12 surveillance footage. Mr. Seitz told the Investigators he had left his jacket at work, but the next day, Andryshak observed Mr. Seitz wearing a dark jacket on his way to work.

Perhaps most damaging to the Seitzes' claims is that prior to Mr. Seitz's arrest, a neutral judge approved a search warrant for the Seitzes' home on the basis of these same facts.[10] The Fourth Amendment provides that "no Warrants shall be issued, but upon probable cause." U.S. Const. amend. IV. The focus of the inquiry differs in the search context—Town Justice Goldsmith approved the search warrant because he determined there was probable cause that the search of the Seitzes' home would produce evidence of a crime. The issuance of the search warrant, however, strongly suggests that the Investigators were objectively reasonable in their belief that probable cause existed to arrest Mr. Seitz. In other words, the approval of the search warrant bears on the objective reasonableness of the Investigators' determination that probable cause existed for Mr. Seitz's arrest because the two probable cause determinations depended on the same set of facts.

To be sure, there are some facts that cut against the likelihood that Mr. Seitz was the culprit in the Gander Mountain larceny. The Investigators never connected Mr. Seitz to a red pickup truck matching the description of the vehicle in which the suspect fled. They knew the Seitzes owned no such vehicle, did not observe a red pickup truck at or near the Seitzes' home, and did not inquire whether Mr. Seitz's employer owned such a vehicle. The Investigators did not use a photo array with the eyewitnesses prior to Mr. Seitz's arrest.[11]

The Seitzes claim that the Investigators' failure to explain the lack of a red pickup truck and to conduct a photo array prior to Mr. Seitz's arrest render the probable cause determination objectively unreasonable. The Investigators, however, were under no obligation to pursue every lead to ensure they were correct; if they reasonably believed they had amassed enough facts to believe probable cause existed, they were free to arrest Mr. Seitz. *See Ricciuti v. New York City Transit Auth.,* 124 F.3d 123, 128 (2d Cir.1997).

 Moreover, the Seitzes rely heavily on the fact that Mr. Seitz told the Investigators that he was not depicted in the February 12 surveillance footage; he identified a small patch of hair under his mouth in his appearance on both February 10 and February 16 that was not present in the February 12 footage. The Seitzes allege that it was objectively unreasonable

---

**10.** Two warrants issued to search Mr. Seitz's possessions; Town Justice Goldsmith authorized one warrant for the Seitzes' home and another for his vehicle. The warrant to search Mr. Seitz's work truck issued after his arrest, however, and is thus not relevant to the probable cause determination based on the investigators' knowledge at the time of Mr. Seitz's arrest.

**11.** The Investigators later asked two eyewitnesses to identify the suspect in a photo array;

both witnesses indicated that the photograph of Mr. Seitz was or could have been the suspect. Lineup, Signed Caitlin Bernstein (Feb. 20, 2006), Defs.' Ex. P, ECF No. 25–4; Lineup, Signed Katlyn Storms (Feb. 20, 2006), Defs.' Ex. Q, ECF No, 25–4. The Seitzes correctly point out that the results of these arrays do not inform the reasonableness of the Investigators' arrest, because the identifications post-date the arrest, which occurred on February 16, 2006.

for the Investigators to ignore this exculpatory evidence. That is not, however, a proper legal conclusion. Although further action by DeQuarto and Andryshak might have spared Mr. Seitz arrest in this case, the police are under no obligation to investigate claims of innocence, even when the suspect alleges that his or her innocence is based on mistaken identity. *See Panetta,* 460 F.3d at 395–96 (holding that a suspect's ability to proffer an innocent explanation for the facts "does not negate probable cause"). Indeed, "a mistaken identity can provide the basis for probable cause" when "the police have probable cause to arrest the person sought and the arresting officer reasonably believed that the arrestee was that person." *Martinez v. City of New York,* 340 Fed.Appx. 700, 701 (2d Cir.2009) (citing *Hill v. California,* 401 U.S. 797, 802–03, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971)).

Here, the undisputed facts indicate that a reasonable police officer in the Investigators' position would have been warranted in concluding that probable cause existed to arrest Mr. Seitz. The Seitzes' proffered arguments do not undermine the reasonableness of the probable cause determination at the time of Mr. Seitz's arrest. Summary judgment is appropriate for the Defendants on Mr. Seitz's Section 1983 claim. *See Ricciuti,* 124 F.3d at 128 (citing *Lennon v. Miller,* 66 F.3d 416, 421 (2d Cir.1995)).

As a result of this Court's ruling that arguable probable cause existed, qualified immunity shields the investigators from liability for Mr. Seitz's Section 1983 claim. *See Finigan,* 574 F.3d at 61–62. No federal claims remain in this case. This Court declines to exercise supplemental jurisdiction over the pendent state law claims. *See* 28 U.S.C. § 1367(c)(3); *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7,

108 S.Ct. 614, 98 L.Ed.2d 720 (1988). This Court thus need not reach the question of whether actual probable cause existed in order to dispose of the false arrest and malicious prosecution claims.

## IV. CONCLUSION

For the reasons articulated above:

1. This Court grants summary judgment with respect to all claims against the New York State Police. Eleventh Amendment sovereign immunity shields the state from damages actions filed by its citizens.

2. This Court grants summary judgment with respect to DeQuarto and Andryshak in their official capacities. As with the State Police, under the Eleventh Amendment, the Investigators are immune from suit for damages in their official capacities.

3. This Court grants summary judgment with respect to DeQuarto and Andryshak in their individual capacities on Mr. Seitz's claims under 42 U.S.C. § 1983. The Investigators are entitled to qualified immunity because arguable probable cause existed at the time of the arrest. Objectively reasonable police officers, given the facts available to the Investigators at the time of the arrest, would have been warranted in concluding that probable cause existed.

4. This Court declines to exercise supplemental jurisdiction with respect to Mr. Seitz's unlawful imprisonment, false arrest, and malicious prosecution claims against the Investigators in their individual capacities, and to Ms. Seitz's derivative claim.

For all of these reasons, the Defendant's motion for summary judgment [ECF No. 23] is **ALLOWED,** and judgment shall enter for the Defendants on the federal

claims. The pendant state claims are dismissed.

**SO ORDERED.**